UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONALD HARDY                          :
5440 85TH Avenue, Apt. 102            :
New Carrollton, MD  20784, *and*      :
                                      :
DENIS B. GARCIA                       :
1309 Clifton Street, N.W.             :
Apt T-3                               :
Washington, D.C. 20009, *and*         :
                                      :
MARTELL LEGRAND                       :  Civil Action No.
FCI Beckley                           :  TRIAL BY JURY DEMANDED
1600 Industrial Road                  :
Beaver, WV  25813                     :
                                      :
        *Plaintiffs*                  :
                                      :
v.                                    :
                                      :
THE DISTRICT OF COLUMBIA              :
A Municipal Corporation               :
441 4th Street, N.W.                  :
Washington, D.C. 20001*, and*         :
                                      :
    Serve:                            :
    The Honorable Adrian Fenty        :
    Mayor of the District             :
    of Columbia                       :
    John A. Wilson Building           :
    1350 Pennsylvania Ave., N.W.      :
    Washington, D.C. 20004, *and*     :
                                      :
    Office of the Attorney General    :
    441 4th Street, N.W.              :
    Washington, D.C. 20001            :
                                      :
ODIE WASHINGTON, Individually         :
and In His Official Capacity          :
Director (Retired),                   :
DC Department of Corrections          :
1923 Vermont Avenue, NW               :
Suite 202A                            :
Washington, DC  20001, *and*          :
                                      :
STEVEN A. SMITH, Individually         :
and In His Official Capacity          :

1

```
Warden (Retired), D.C. Jail      :
1901 D Street, SE                :
Washington, DC  20003, and       :
                                 :
PRISON REALTY TRUST A.K.A.       :
CORRECTIONS CORPORATION OF       :
AMERICA                          :
1901 E Street, SE                :
Washington, DC  20003            :
                                 :
Serve:                           :
CT Corporation System            :
1015 15th Street, N.W., #1000    :
Washington, DC  20005            :
                                 :
    Defendants                   :
```

### COMPLAINT
(Civil Rights Violations, Negligence,
Negligent Selection and Retention)

### I.  Jurisdiction

1.  This is a civil action seeking compensatory and punitive damages for injuries suffered by Ronald Hardy, Denis Garcia, and Martell Legrand.  This action arises under 42 U.S.C. §1983, 42 U.S.C. §1988, the United States Constitution and the common law of the District of Columbia.

2.  This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  Venue is proper under 28 U.S.C. §1391(b).

### II. Parties

3.  Plaintiff Ronald Hardy is an adult natural person who, at all times relevant to this action, has been incarcerated

within the District of Columbia Department of Corrections, within correctional contract facilities operated and/or supervised by defendant District of Columbia, and within various other correctional facilities to which he has been transferred by the District of Columbia.

4.   Plaintiff Denis Garcia is an adult natural person who, at all times relevant to this action, has been incarcerated within the District of Columbia Department of Corrections, within correctional facilities operated by defendant District of Columbia, and within various other correctional facilities to which he has been transferred by the District of Columbia.

5.   Plaintiff Martell Legrand is an adult natural person who, at all times relevant to this action, has been incarcerated within the District of Columbia Department of Corrections, within correctional facilities operated by defendant District of Columbia, and within various other correctional facilities to which he has been transferred by the District of Columbia.

6.   Defendant District of Columbia (hereinafter "DC"), is a municipal corporation. It has, and at all times relevant to this action had, responsibility for persons incarcerated under its authority. The District of Columbia Jail, a/k/a the Central Detention Facility, is a local detention facility located within the District of Columbia and is utilized by the District of Columbia Department of Corrections (hereinafter "DC DOC") for

the purpose of housing pretrial detainees and other persons who have been sentenced under the laws of the District of Columbia. Its employees and agents act under color of law in all activities with respect to the incarceration of prisoners at the Central Detention Facility.

7.    Defendant Odie Washington was the Director of the D.C. Department of Corrections and held that position at all relevant times. Defendant Washington is sued in both his official capacity and individual capacities.

8.    Defendant Steven A. Smith was Warden at the Jail at the time of the attacks on Messrs. Garcia and Legrand. Defendant Smith is sued in both his official capacity and individual capacities.

9.    Defendant Prison Realty Trust, A/K/A Corrections Corporation of America (hereinafter "CCA"), is a foreign corporation with its principal place of business in Tennessee, doing business in Washington, D.C.  It operates the Correctional Treatment Facility (hereinafter "CTF") located at 1901 E Street, SE Washington, DC  20003. Its employees and agents act under color of law in all activities with respect to the incarceration of prisoners at the CTF Facility.

### III. Factual Allegations

10.  The DC DOC is charged by the DC Code §24-211.02 with responsibility for the safekeeping, care, protection, instruction and discipline of all persons housed in its penal institutions, including plaintiffs Hardy, Garcia, and Legrand.

11.  DC contracted with defendant CCA to send prisoners detained or sentenced under the laws of the District of Columbia, including plaintiff Hardy, to CTF, operated by CCA. Upon information and belief, CCA continues to operate CTF.

12.  For over thirty (30) years, up to and including January 19, 2005, the District of Columbia was operating and maintaining its prison facilities in a hazardous and unsafe condition.

13.  *Campbell v. McGruder* and *Inmates of DC Jail v. Jackson*, respectively, both were lawsuits filed in the 1970s seeking redress for unconstitutional conditions at the DC Jail. *Campbell* was filed on behalf of pretrial detainees confined to DC Jail.  *Inmates of DC Jail* was filed on behalf of sentenced prisoners housed at the DC Jail.  U.S. District Court Judge William B. Bryant held that the conditions of confinement in the Jail were so overcrowded and otherwise inhumane that they violated the Eighth Amendment prohibition against cruel and unusual punishment.

14.  For many years thereafter, the District consistently violated the District Court's orders stemming from the above

5

cited lawsuits, and failed to bring the Jail up to minimal constitutional standards. In 1985, the Court found that conditions at DC Jail continued to violate prisoners' constitutional rights:

> Time and again, defendants [the District] have requested the Court to defer to their accumulated wisdom, to stay its hand and to give them more time. Time and again, these requests have been honored in the hope and expectation that defendants would solve these problems expeditiously and effectively. However, instead of matters improving, they have deteriorated.

(Memorandum and Order, July 15, 1985, at 50.)

15. The Court's findings were based on many factors, including evidence that prisoners were confined in cells with non-functioning toilets and sinks, basic supplies were denied to many inmates, medical care was grossly deficient, and assaults and stabbings were regular occurrences.

16. As a result of defendant DC's maintenance of these unconstitutional conditions, in 1985 Judge Bryant imposed an inmate population cap of 1,694.

17. The District's failure to operate its incarceration facilities according to constitutional minimums was not confined to the Jail. In 1986, inmates at the District's now-defunct Occoquan Facility of the Lorton Correctional Complex filed a class action alleging that the health and safety conditions at

Occoquan also violated the Eighth Amendment.  Judge June Green
of this Court agreed, finding that:

> the present conditions relating to prisoner
> safety and mental health objectively violate the
> Eighth Amendment. . . . [T]he combination of
> understaffing, crowding classification deficits,
> plant deterioration, idleness and environmental
> and safety deficiencies have a mutually
> enforcing effect that exposes the Plaintiffs to
> a constitutionally unacceptable risk of violent
> assault and death. . . . These conditions
> violate contemporary standards of decency.

Memorandum at 5, *Inmates of Occoquan v. Barry*, No. 86-2128
(D.D.C. Dec. 15, 1995).  The Court also specifically criticized
defendants for the use of "staff assignment rosters [that] are
misleading because they indicate two, sometimes three officers
in each dormitory when, in reality, it is much less due to
officers being 'pulled'" out of the unit.  *Inmates of Occoquan
v. Barry*, 717 F. Supp. 854, 864 (D.D.C. 1989).

18.  The consent order and various rulings in *Campbell*, the
Court's numerous opinions and orders in *Inmates of Occoquan*,
expert reports, numerous lawsuits, and the legal landscape with
respect to prison conditions that developed over the 1980s and
1990s clearly established to the District, CTF, and its
officials the constitutional requirements for conditions at the
Jail and CTF, and defendants Washington and Smith knew or should
have known of these requirements, and were bound by them.

19.  Even with the Court-imposed population cap, the
District continued to defy numerous court orders designed to

remedy the unconstitutional conditions at the Jail. Finally, in 1993, the Court appointed a Special Officer to assist in ensuring compliance with its orders. In her February 1994 status report, the Special Officer documented that the District remained in "substantial noncompliance" with the Court's orders. The District did not dispute the Special Officer's findings and agreed to be held in contempt of court as part of a 1994 Consent Order. The Consent Order set forth a remedial plan with specific timetables to achieve compliance with constitutional requirements. Again, however, the District failed to comply. In light of the District's chronic noncompliance, in 1995 the Court appointed a Receiver for medical care at the Jail.

20.    In June 2002, the District asked the Court to lift the population cap in *Campbell*.    In support of this request, the District stated that "the Department of Corrections has substantially improved the conditions at and operation of the Central Detention Facility [the Jail] and there are no systemic on-going unconstitutional conditions that would justify the continued imposition of a population limitation . . . ." Defendant's Motion to Terminate the Population Limitation at 1, *Campbell v. McGruder*, No. 71-1462 (D.D.C. June 7, 2002). In so doing, the District represented that it had implemented and/or would develop adequate staffing, security, and classification procedures in light of the population increase it sought.

Moreover, in 2002, defendant Washington submitted a Declaration to the Court in a related case swearing that the "critical staffing complement" at the Jail would be filled at all times, and that there would be three officers on the day and evening shifts for all cellblocks that were double-celled. Declaration of Odie Washington ¶ 5-6, *Fraternal Order of Police v. Williams*, No. 02-461 (D.D.C.).

21. On June 24, 2002, without the benefit of an evidentiary hearing, the Court terminated the population cap at the Jail that had been imposed in *Campbell*.

22. Within months, defendants knowingly and intentionally increased the daily population at the Jail to over 2,300 inmates, overwhelming already deficient operating systems.

23. Despite this inmate population increase of almost forty percent (40%), there was no corresponding increase in the number of correctional staff assigned by defendants to provide security to prisoners at the Jail. Conditions were so dangerous that correctional officers brought suit in federal court to compel an improvement in the health and safety conditions at the Jail, which had been worsened by the intentional overcrowding.

24. Even before the inmate population ballooned in 2002, the Jail had operated without an inmate classification system to evaluate and assign safe housing and supervision to pretrial detainees. Inmates charged with nonviolent misdemeanors were

housed alongside convicted violent felons, and no effort was made to separate predatory pretrial detainees charged with murders and other violent crimes from those charged with less serious or non-violent offenses. Although classification systems are routinely used by jails to assign inmates to the most appropriate level of custody and security, to make housing assignments, and to protect vulnerable inmates from predatory prisoners, the District recklessly and intentionally refused to conduct this basic screening process for pretrial detainees.

25. The District also repeatedly failed to provide sufficient staffing, to implement necessary security procedures at the Jail, and to training and supervision of Jail employees.

26. The security measures in place at the Jail were severely lacking. Such inadequacies included, but were not limited to, the failure to control contraband, install metal detectors, and conduct and document frequent and unannounced housing unit, inmate, and cell shakedowns.

27. Additionally, Jail employees were inadequately trained and supervised by the District and its correctional officials. The inadequacy of training and supervision was ongoing, and defendants failed to improve the training programs or require critical supervision of prison guards.

28. These deficiencies were well known to the DC DOC management, including all defendants, long before it sought to

increase the inmate population. A 1995 study (DC Jail Comparison of Staffing Recommendations) warned that the District must provide adequate relief at meal breaks in order to ensure that there would never be a reduction in guard coverage. In a 1996 report on the Department of Corrections (District of Columbia Department of Corrections Study) by the National Institute of Corrections, Dr. James Austin concluded that the DC DOC must develop a classification system for its pretrial population, which accounted for seventy percent (70%) of the Jail population.

Dr. Austin found numerous dangerous deficiencies at the Jail including, without limitation:

a) no objective classification system for the pretrial population (p. 18);

b) a need to develop an objective classification system for the pretrial population (p. 31);

c) no system-wide standards for inmate housing units (p. 37); and

d) major deficiencies in the majority of housing units, e.g.:

 i.   substantial overcrowding (p. 37);

 ii.  limited staff to provide security supervision and response capability (p. 37);

 iii. inadequate sight lines (p. 37);

 iv.  inappropriate assignment of inmates relative to their custody levels (p. 37);

 v.   circulation and movement control systems that

did not allow for constant supervision of inmates when they were outside of their assigned cells (p. 37);

vi. staffing in open areas that was insufficient to provide appropriate observation of inmates (p. 38); and

vii. the absence of closed circuit televisions, which were a necessity for adequate supervision and security because of the design of the facility, in many areas that were not visible to the officers (p. 67).

29.  In 1997, a follow-up report (Assessment of the District of Columbia Department of Corrections), which was funded by the Federal Bureau of Prisons and conducted by the National Institute of Corrections, again highlighted dangerous security deficiencies at the Jail:

a) the absence of a classification system for pretrial detainees, who were the majority of the inmates (p. 65); and

b) the DOC's failure to adopt the new classification forms and procedures or implement any of the other recommended tasks, but rather to continue to operate under its antiquated classification system established in 1987 (p. 66).

30.  In the three (3) years leading up to the assaults on the plaintiffs herein – at the same time that District officials were successfully seeking to persuade the Court to lift the population cap imposed by *Campbell* and subsequently increasing the number of inmates by nearly 40% – urgent warnings to District officials about life-threatening conditions at the Jail became more frequent and ominous:

a) **April 13, 2001** -William H. Dupree, chairman of the Fraternal Order of Police Department of Corrections Labor Committee, wrote to Odie Washington, Director of the DC Department of Corrections, that the administration's plan to "increase the inmate population at the DC Jail...while simultaneously eliminating security posts and decreasing the work force...will present a major risk to the safety of...inmates confined at that facility."

b) **September 29, 2001 -** A study (District of Columbia Department of Correction Staffing and Overtime Assessment) prepared by Security Response Technologies, Inc. warned that the District must "implement the proposed critical minimum staffing complement as the CDF's base roster of mandatory posts." (p.2)

c) **November 9, 2001 -** Mr. Dupree wrote to Mayor Williams concerning "an urgent safety and security matter at the DC Jail.... The Department of Corrections is in the process of implementing a very irresponsible plan that not only violates the Court ordered ceiling at the DC Jail, but compromises the safety of both staff and inmate populations."

d) **November 12, 2001 -** James F. Wallington, Esquire, an attorney representing the Fraternal Order of Police Department of Corrections Labor Committee wrote to the Special Officer requesting assistance in seeking "a temporary restraining order directing the Office of the Mayor...and the Director of the DC Department of Corrections to cease the intentional overcrowding at the DC Jail. As of Sunday, November 11, 2001, the Department of Corrections has failed to increase the correctional officer staff at the DC Jail to address the immediate influx of inmate population."

e) **November 14, 2001 -** Correctional Officer Irving Robinson, who was assigned to the DC Jail, wrote that "it is my observation that the overcrowded conditions at the DC jail poses an immediate threat to staff and inmates."

f) **November 16, 2001 -** Mr. Dupree swore in an affidavit that "again the Department has deceived the employees of the Department of Corrections and their representatives in a matter which clearly places the health and safety of employees and the public at risk...based upon my experience as a correctional officer, I am of the opinion that these overcrowding

conditions will only get worse and lead to serious injury or death...."

g) **May 21, 2002 -** The Special Officer reported that DOC Director Washington, in a March 25, 2002 Declaration, filed with the Court, represented that all posts on the "Critical Staffing Complement" would be filled at all times. However, according to shift rosters, cellblocks with an inmate population of 100 inmates or greater were not consistently staffed with three (3) officers. (p.5-6)

h) **June 4, 2002 -** The Special Officer reported that "According to the shift rosters and the cellblock logs, there have been numerous instances when cellblocks containing greater than 100 inmates have not been assigned three (3) officers.... I feel strongly that the Department of Corrections should adhere to its representations made in the Declaration filed with the Court."(p.5)

i) **November 13, 2002 -** Pamela Chase, Chairperson of the Fraternal Order of Police Department of Corrections Labor Committee testified at an Oversight Hearing of the DC Department of Corrections that staffing shortages had created "reoccurring breaches in public safety and embarrassing incidents within the

Department of Corrections.... Essential equipment and staffing have been sacrificed...placing lives at risk and immediate action must be taken."

j) **November 26, 2002** - The Honorable Kathleen Patterson, the District of Columbia City Council Judiciary Committee chairperson, and Ward 6 Councilmember Sharon Ambrose, wrote to Mayor Williams, stating in part as follows: "We are very concerned that the conditions appear to be worsening...at the DC Jail due to overcrowding.... In sum, we fear for the physical safety of inmates, staff and the public at large."

k) **December 11-14, 2002 -** The problems at the Jail culminated in two murders and a third near-fatal stabbing over a four day span in December 2002. On December 11, 2002 while incarcerated in the Southeast One cellblock at the Jail, Givon Pendleton was brutally attacked by inmate Dominic Jones. Jones stabbed Mr. Pendleton repeatedly with a metal weapon, believed to be a street knife, that likely had been smuggled into the institution. Mr. Pendleton died from his injuries.

On December 13, 2002, a second inmate - plaintiff Bradley Raymond Autman (a military veteran

with a prosthetic leg) — was stabbed in the neck by
another prisoner at the Jail. Mr. Autman survived
the attack, although he sustained serious injuries.
On December 14, 2002, a third inmate - Mikal Gaither -
was stabbed at the Jail. Like Mr. Pendleton, Mr. Gaither
died from injuries he sustained in the attack.    The
circumstances surrounding the stabbings of Messrs.
Pendleton, Autman, and Gaither were remarkably similar
to one another and followed a well-documented pattern of
inmate violence at the Jail. Both Messrs. Pendleton and
Gaither were pretrial detainees who were murdered by
predatory inmates with histories of aggravated violence
against other inmates, and while both assailants  were
being preventively detained on murder charges. Each
stabbing took place outside the presence or sight of any
correctional officer in a cellblock, overcrowded with
misclassified inmates, and after one of the critical
officers assigned to the housing unit had abandoned his
security post without first securing a relief officer.

l) **October 26, 2003 -**    Marquee Venable (the inmate
who eventually assaulted  plaintiff Denis Garcia)
assaulted an inmate by throwing scalding liquid at
him    while the inmate was sitting in his cell.
The liquid had been heated in the unsupervised

microwave in the Northwest Two cellblock at the DC Jail. The inmate suffered first and second degree burns to his face, neck, and scalp.

m) **December 20, 2003** - Shooting of four inmates in the maximum security cellblock unit, with a gun that had been smuggled into the D.C. Jail. A guard was at lunch during the incident.

n) **March 1, 2004 -** Testimony at a D.C. Council Oversight Hearing for the D.C. Department of Corrections that identified continuing indifference to security at the jail. "In every major stabbing and shooting receiving publicity since December 2002, no correctional officer saw or heard it. And each of these incidents occurred when a prison guard had abandoned his or her post in the housing unit, after superiors sent no relief guard to replace them. During October, November & December 2003, most assaults at the jail continued to be unwitnessed and undeterred by staff. The majority occurred when housing unit posts were left unstaffed." Director Odie Washington and Warden Steve Smith attended this hearing, and listened to these warnings.

31.  The overcrowding, understaffing, and substantial and unreasonable risk to detainee and inmate safety described above became known to the highest policymakers in the District government and to corrections officials through court orders, studies, technical and expert reports that were provided to the District, testimony and documents generated at City Council oversight hearings, lawsuits filed against the District and CTF, settlements entered into by the District, adverse verdicts delivered against the District by juries, a long line of inmate assaults at the Jail, and by other means. These documents and events clearly established to defendants the constitutional requirements for conditions at the Jail. Despite their longstanding awareness of the conditions of confinement at the Jail and the clearly established constitutional requirements for the facility, defendants adopted a custom or policy with respect to the operations of the Jail that was deliberately indifferent to, and recklessly disregarded, the safety and security of the detainees and inmates housed there. Defendants' actions caused a substantial and unreasonable risk to inmate and detainee safety.

32.  Against this backdrop, on or about March 2, 2004, while incarcerated in the Southwest One cellblock at DC Jail, **Denis Garcia** was assaulted by Marquee Venable, who threw scalding liquid at him while Mr. Garcia was locked in his cell.

Mr. Garcia suffered severe burns to his face, neck, scalp, and chest, among other injuries.

33. No prison guard saw, heard, or was present at the time of the assault to supervise, monitor or deter the assault on Mr. Garcia by Marquee Venable, a predatory inmate with a documented history of assaulting other detainees.

34. On or about October 31, 2004, plaintiff **Ronald Hardy** was assaulted in the same manner when a scalding liquid was thrown on him while incarcerated at CTF. He suffered severe burns to his face, nose, forehead, and other areas, and was otherwise assaulted as well.

35. No prison guard saw, heard, or was present at the time of the assault to supervise, monitor or deter the assault on Mr. Hardy.

36. On or about January 19, 2005, plaintiff **Martell Legrand** was assaulted in the same manner when a scalding liquid was thrown on him while incarcerated in the SW 3 cellblock at DC Jail. He suffered severe burns to his face, shoulders, upper body and other areas. He also received a human bite, and was otherwise assaulted.

37. No prison guard saw, heard, or was present at the time of the assault to supervise, monitor or deter the assault on Mr. Legrand.

38. Taken as a whole, these examples document the defendants' custom and policy of exhibiting deliberate indifference to its constitutional duty to protect pretrial and recently sentenced detainees at the DC Jail and at CTF. All of these matters became known to the highest policymakers in the District government through court orders, studies, reports, expert reports which were provided to the District, lawsuits filed against the District, settlements entered into by it and adverse verdicts delivered by juries. These documents placed the District on notice of the unconstitutional conditions of confinement at DC Jail and at CTF.

39. All of the deficiencies previously alleged and attributed to defendant DC, including but not limited to understaffing, overcrowding, constant and prevailing violence, lack of supervision by correctional staff and other penological deficiencies also existed at the CTF facility. These failings were known to defendants DC and CCA and placed the defendants CCA and DC on notice of the unconstitutional conditions of confinement at the DC Jail and at CTF.

## COUNT ONE

(42 U.S.C. § 1983 – Violation of Eighth Amendment)
(All Defendants)

40.  Plaintiffs hereby incorporate paragraphs 1 through 39, supra, as set forth herein.

41.  At all relevant times, defendants operated the Jail and CTF under color of state law and – having incarcerated plaintiffs at these facilities, stripped them of all means of self-protection, and foreclosed access to private aid – were constitutionally required to provide plaintiffs and other inmates with protection from substantial and unreasonable risk of harm.

42.  Inmates housed in the Jail and at CTF were subject to a substantial and unreasonable risk of violent injury as a result of the unconstitutional conditions at the Jail and at CTF, which included historic and pervasive violence, overcrowding, a shortage of staff, a lack of staff training, negligent supervision of correctional officers, and inadequate policies and procedures for staffing, classification, and security.  Defendants were repeatedly made aware of these constitutionally infirm and dangerous conditions, but they purposely and consistently failed to take action to remedy those conditions.  To the contrary, defendants adopted a pattern, practice, custom, or policy of acting with deliberate indifference and reckless disregard for the safety, security, and protection of inmates, and/or acted in violation of clearly established constitutional requirements for prison conditions.

43. Defendants' continual failure to address these conditions was and is the result of a conscious and deliberate decision or reckless disregard.

44. Defendants' pattern, practice, custom, or policy of deliberate indifference to, or reckless disregard for, the substantial and unreasonable risk of harm to inmate safety at the Jail and at CTF directly and proximately caused plaintiffs' injuries, thus depriving them of their Eighth Amendment right to be free of cruel and unusual punishment, in violation of 42 U.S.C. § 1983. Plaintiffs experienced bodily pain and mental anguish, and suffered pecuniary loss, including, but not limited to, hospital and medical expenses and loss of future earnings.

**COUNT TWO**

(42 U.S.C. § 1983 – Violation of Fifth Amendment)
(All Defendants)

45. Plaintiffs hereby incorporate paragraphs 1 through 44, supra, as set forth herein.

46. At all relevant times, defendants operated the Jail and CTF under color of state law and – having incarcerated plaintiffs at these facilities, stripped them of all means of self-protection, and foreclosed their access to private aid – were constitutionally required to provide plaintiffs and other

pretrial detainees with protection from substantial and unreasonable risk of harm.

47. Pretrial detainees housed in the Jail and at CTF were subject to a substantial and unreasonable risk of violent injury as a result of the unconstitutional conditions at these facilities, which included historic and pervasive violence, overcrowding, a shortage of staff, a lack of staff training, negligent supervision of correctional officers, and inadequate policies and procedures for staffing, classification, and security. Defendants were repeatedly made aware of these constitutionally infirm and dangerous conditions, but they purposely and consistently failed to take action to remedy those conditions. To the contrary, defendants adopted a pattern, practice, custom, or policy of acting with deliberate indifference and reckless disregard for the safety, security, and protection of pretrial detainees, and/or acted in violation of clearly established constitutional requirements for prison conditions.

48. Defendants' continual failure to address these conditions was and is the result of a conscious and deliberate decision or reckless disregard.

49. Defendants' pattern, practice, custom, or policy of deliberate indifference to, or reckless disregard for, the substantial and unreasonable risk of harm to pretrial detainee

safety at the Jail and at CTF directly and proximately caused plaintiffs' injuries, in violation of the Fifth Amendment and 42 U.S.C. § 1983. Plaintiffs experienced bodily pain and mental anguish, and suffered pecuniary loss, including, but not limited to, hospital and medical expenses and loss of future earnings.

### COUNT THREE

(42 U.S.C. § 1983 – Violation of Fifth Amendment)
(All Defendants)

50. Plaintiffs hereby incorporate paragraphs 1 through 49, supra, by reference.

51. As pretrial detainees, plaintiffs had not yet been found guilty and thus could not be subjected to punishment.

52. Defendants subjected plaintiffs to jailhouse conditions so dangerous, horrible, and cruel that they amounted to punishment rather than to reasonable effectuation of legitimate municipal objectives.

53. Defendants' pattern, practice, custom, or policy of housing pretrial detainees in facilities that were characterized by historic and pervasive overcrowding, a shortage of staff, a lack of staff training, and dangerous policies and procedures for staffing, classification, and security constituted punishment in violation of the clearly established rights of pretrial detainees under the Due Process Clause of the

Fifth Amendment and 42 U.S.C. § 1983, and proximately caused plaintiffs' injuries.

## COUNT FOUR

(42 U.S.C. § 1983 – Violation of Fifth Amendment)
(All Defendants)

54. Plaintiffs hereby incorporate paragraphs 1 through 53, supra, as set forth herein.

55. By taking plaintiffs into custody and holding them there against their will, and by restricting their ability to defend themselves from injury to their life, liberty, and bodily integrity, defendants incurred an affirmative duty to protect plaintiffs' safety and general well-being.

56. Defendants grossly ignored their responsibilities and breached this duty. By persistently perpetuating and refusing to remedy the unconstitutional and dangerous conditions at the Jail and at CTF – of which they had been aware for many years and on which they had been advised by both courts and experts to act on numerous occasions – defendants exhibited a custom and policy of deliberate indifference or reckless disregard, and/or acted in violation of clearly established constitutional requirements for providing security in prisons.

57. Defendants' pattern, practice, custom, or policy of deliberate indifference to, or reckless disregard for, the substantial and unreasonable risk of inmate violence and injury

26

at the Jail and CTF constituted conduct so egregious or outrageous that it shocks the contemporary conscience; such conduct deprived plaintiffs of substantive due process under the Fifth Amendment, in violation of 42 U.S.C. § 1983, and proximately caused plaintiffs' injuries.


### COUNT FIVE

(42 U.S.C. § 1983 – Violation of Fifth and Eighth Amendments)
(All Defendants)

58. Plaintiffs hereby incorporate paragraphs 1 through 57, supra, by reference.

59. At the time of the assaults on plaintiffs, the Jail and CTF were staffed by guards who were inadequately supervised and trained.

60. Because the guards were inadequately supervised and trained, and were too few in number, they failed properly to monitor, supervise, and secure the area, and left their security posts with no relief officer to prevent or deter the attacks upon plaintiffs. The staff assignment rosters were drafted in such a way that it was impossible to provide continuous coverage in housing units during staff breaks.

61. At all relevant times, defendants were aware of an ongoing deficiency in the city's training program for Jail and CTF guards and in the supervision of those guards on the job.

Despite their awareness of this continuing problem, defendants failed to improve the training programs or require necessary supervision of correctional employees.

62. The need for more and different training and better supervision of correctional personnel was so obvious, and the inadequacy so likely to result in the violation of the constitutional rights of pretrial detainees and inmates, that the defendants acted with deliberate indifference in failing to remedy the need.

63. Defendants adopted a pattern, practice, custom, or policy of acting with deliberate indifference to and reckless disregard for the need for adequate training and supervision of correctional employees.

64. Defendants' continual failure to address the lack of adequate training and supervision was the result of a conscious and deliberate decision or reckless disregard.

65. Defendants' pattern, practice, custom, or policy of deliberate indifference to, or reckless disregard for, the need for adequate training and supervision of correctional employees directly and proximately caused plaintiffs' injuries, thus depriving them of their constitutional rights under the Fifth and Eighth Amendments, in violation of 42 U.S.C. § 1983. Plaintiffs experienced bodily pain and mental anguish, and they

suffered pecuniary loss, including, but not limited to, hospital and medical expenses and loss of future earnings.


## COUNT SIX

(Negligent Monitoring and Supervision of Residents)
(District of Columbia)

66.  Plaintiffs hereby incorporate paragraphs 1 through 65, *supra*, by reference.

67.  Defendant DC knew, or should have known, that due to its lack of security measures at DC Jail including, but not limited to, its failure to secure hazardous and boiling substances, its failure to supervise residents with access to such dangerous materials and its failure to provide adequate staffing, it was reasonably foreseeable that residents, including plaintiffs, would be attacked by other residents with such dangerous substances. In particular, plaintiffs' assailants were permitted unsupervised access to microwaves which they were able to use to pour boiling substances onto plaintiffs without deterrence by a correctional guard.

68.  As a direct and proximate result of the above-described negligence, plaintiffs were each assaulted with a boiling substance.  Each suffered grave bodily injury.  Each experienced bodily pain, mental anguish, disfigurement and scarring. Each also suffered pecuniary loss, including, but not

limited to, hospital and medical expenses and loss of future earnings.

## COUNT SEVEN

(Negligent Medical Treatment)
(District of Columbia)

69.  Plaintiffs hereby incorporate paragraphs 1 through 68, *supra*, by reference.

70.  Each of the plaintiffs continuously requested medical care, treatment and attention.  Such requests were met with either outright denials or with limited and inappropriate care, treatment and attention.

71.  As described above, and elsewhere in plaintiffs' medical records, defendant negligently failed to provide medically necessary follow-up medical treatment for plaintiffs' burns.

72.  As a direct and proximate result of the above-described negligence, each plaintiff suffered increased bodily injury.  They experienced bodily pain and mental anguish, and suffered pecuniary loss, including, but not limited to, hospital and medical expenses and loss of future earnings.

## COUNT EIGHT

(Negligent Selection, Supervision and Retention of CCA)

30

(District of Columbia)

73. Plaintiffs hereby incorporate paragraphs 1 through 72, *supra*, by reference.

74. CCA has had numerous complaints and lawsuits filed against it concerning its operation of its penal facilities, from which it should have been apparent that it would not be able to run a facility such as CTF properly. These problems were known, or should have been known, to the defendant District of Columbia.

75. Defendant, District of Columbia, knew or should have known that CCA was an unsuitable entity to run CTF. Despite this, it negligently selected and then negligently monitored and retained CCA to run the facility, and to provide medical care to residents including plaintiff Hardy, housed at CTF.

76. As a direct and proximate result of the above-described negligence, plaintiff Hardy was assaulted with scalding liquids and subsequently received substandard medical care. He suffered grave bodily injury. He experienced disfigurement, bodily pain and mental anguish, and he suffered pecuniary loss, including, but not limited to, hospital and medical expenses and loss of future earnings.

## COUNT NINE

(Negligent Monitoring and Supervision of Residents)

(Corrections Corporation of America)

77. Plaintiff Hardy hereby incorporate paragraphs 1 through 76, *supra*, by reference.

78. Defendant CCA knew, or should have known, that due to its lack of security measures at the CTF facility, including but not limited to, its failure to secure hazardous boiling substances, its failure to supervise residents with access to such dangerous materials, and its failure to provide adequate staffing, it was reasonably foreseeable that residents, including the plaintiff Hardy, would be attacked by other residents with such dangerous substances. In particular, plaintiff Hardy's assailant was permitted unsupervised access to microwaves which he was able to use to heat and pour boiling substances onto plaintiff Hardy without deterrence by a correctional guard.

79. As a direct and proximate result of the above-described negligence, plaintiff Hardy was assaulted with a boiling substance. He suffered grave bodily injury. He experienced bodily pain, mental anguish, disfigurement, and scarring. He also suffered pecuniary loss, including, but not limited to, hospital and medical expenses and loss of future earnings.

**COUNT TEN**

32

(Negligent Medical Treatment)
(Corrections Corporation of America)

80.  Plaintiff  Hardy  hereby  incorporates  paragraphs  1 through 79, *supra,* by reference.

81.  Plaintiff  Hardy  continuously  requested  medical  care, treatment  and  attention.   Such  requests  were  met  with  either outright  denials  or  with  limited  and  inappropriate  care, treatment and attention.

82.  As  described  above,  and  elsewhere  in  plaintiff's medical  records,  defendant  negligently  failed  to  provide medically  necessary  follow-up  medical  treatment  for  plaintiff's burns.

83.  As  a  direct  and  proximate  result  of  the above-described  negligence,  plaintiff  Hardy  suffered  increased bodily  injury.   He  experienced  bodily  pain  and  mental  anguish, and  he  suffered  pecuniary  loss,  including,  but  not  limited  to, hospital  and  medical  expenses  and  loss  of  future  earnings.


**COUNT ELEVEN**
(Negligent Contraband Control)
(All Defendants)

84.  Plaintiffs  hereby  incorporate  paragraphs  1  through  83, *supra*, by reference.

85.  The  defendants,  DC  and  CCA,  were  under  a  statutory  and common  law  duty  to  provide  for  safekeeping,  care,  protection,

instruction and discipline of all persons housed in their penal institutions, including Ronald Hardy, Denis B. Garcia, and Martell Legrand.

86. Defendants knew, or should have known that, due to their lack of prison security measures, including but not limited to the failure to control contraband, failure to properly monitor microwaves, the failure to control dangerous liquids, including but not limited to baby oil, and to conduct and document frequent and unannounced housing unit, inmate and cell shake downs, it was reasonably foreseeable that residents including Messrs. Garcia, Hardy and Legrand would be attacked by other residents using scalding liquids as weapons and instruments causing injury and damage.

87. As a direct and proximate result of the above-described negligence, plaintiffs Garcia, Hardy, and Legrand were each assaulted with a boiling substance. Each suffered grave bodily injury. Each experienced bodily pain, mental anguish, disfigurement and scarring. Each also suffered pecuniary loss, including, but not limited to, hospital and medical expenses and loss of future earnings.

### Prayer for Relief

WHEREFORE, plaintiffs pray that this honorable Court:

a)    Issue a judgment against defendants, jointly and severally, awarding each plaintiff compensatory damages in the amount of $1 million;

b)    Issue any other legal or equitable relief that that the Court deems proper;

c)    Award plaintiffs statutory attorneys' fees [for Constitutional counts] and the costs of this action;

d)    Award plaintiffs punitive damages; and

e)    Award plaintiffs all such other and further relief to which they may be justly entitled.

Respectfully submitted,

SPARKS & SILBER, LLP

Douglas R. Sparks
DC Bar No. 296921
3221 M Street, N.W.,
Washington, D.C. 20007
(202) 338-0687

SAMUEL M. SHAPIRO, P.A.

Samuel M. Shapiro
D.C. Bar No. 176420

200-A Monroe Street, #233
Rockville, MD 20850
(301) 340-1333

Attorneys for Plaintiffs

### JURY DEMAND

Plaintiffs demand trial by jury as to all Counts herein.

_____
Douglas R. Sparks

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ **(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ **(IN U.S. PLAINTIFF CASES ONLY)** NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)  **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and <u>one</u> in a corresponding Nature of Suit)

**☐ A. *Antitrust***

☐ 410 Antitrust

**☐ B. *Personal Injury/ Malpractice***

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. *Administrative Agency Review***

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. *Temporary Restraining Order/Preliminary Injunction***

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. *General Civil (Other)*  OR  ☐ F. *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

☐ **G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

☐ **H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

☐ **I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

☐ **J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

☐ **K.** *Labor/ERISA (non-employment)*

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

☐ **L.** *Other Civil Rights (non-employment)*

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

☐ **M.** *Contract*

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

☐ **N.** *Three-Judge Court*

☐ 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**

☐ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint    **JURY DEMAND:** ☐ YES    ☐ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES    ☐ NO    If yes, please complete related case form.

**DATE**    **SIGNATURE OF ATTORNEY OF RECORD**

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.